UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHN FAY and JANICE FAY,                    Case No. 2:19-cv-10902

     Plaintiffs,                           Hon. F. Kay Behm
v.                                          United States District Judge

WARREN HOSPITALITY
SUITES, INC., a Michigan
Corporation, et al.,

     Defendants.
_____ /

**OPINION AND ORDER ON DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT (ECF No. 124) AND PLAINTIFFS'
MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 123, 125, 126)**

## I.   PROCEDURAL HISTORY

This matter is before the court on the parties' competing Motions
for Summary Judgment.  *See* Defendant's Motion (ECF No. 124);
Plaintiff Janice Fay's Motion (ECF No. 123); Plaintiff John Fay's Motion
(ECF No. 126).[1]  Plaintiffs filed this civil action in March 2019.  ECF
No. 1.  Although this case began with a number of defendants, Warren
Hospitality is the sole remaining Defendant.  *See* ECF 23; ECF 60; ECF
71; *see also* ECF No. 47 (denying motions to intervene).  This case was

_____

[1] John Fay also filed a "concurrence" with Janice's motion (ECF No. 125).

originally assigned to the Honorable George Caram Steeh and was reassigned to the undersigned in August 2023.  ECF No. 87.

This matter was scheduled for trial in July 2024.  ECF No. 91. However, for a number of reasons that are ultimately not critical to understanding this motion, the original attorneys for Plaintiffs withdrew; Plaintiffs now proceed with different attorneys for each of them individually.  *See* ECF No. 99.  This case was further delayed while Defendant sought clarity on their insurance coverage; their state court declaratory judgment action remains pending, however.  *See* ECF No. 107.  Given this breathing room, a review of the history of this case revealed that no summary judgment motions were ever filed.  Thus, during the delay caused by the appearance of new attorneys on Plaintiffs' behalf and awaiting news from Defendant's state court matter, and upon the request of counsel after they familiarized themselves with the case, the undersigned allowed both sets of counsel to file dispositive motions in an effort to determine if trial is necessary in this matter.  ECF 121.

Because the court finds that material disputes of fact remain that preclude judgment as a matter of law as to premises liability, the court

**DENIES** both Defendant's and Plaintiffs' motions; Defendant's motion
is granted in part, and only to the extent that Plaintiffs may not
proceed with ordinary negligence claims.

## II.   FACTUAL BACKGROUND

This case arises from an incident of carbon monoxide poisoning
which occurred at Hawthorne Suites in Warren Michigan on July 25,
2015.  ECF No. 127, PageID.3578.  Plaintiffs checked into Hawthorne
Suites on or about July 22, 2016 (several days before the incident).  ECF
No. 106-2, PageID.3061 (John Fay Deposition); ECF No. 106-3,
PageID.3158 (Janice Fay Deposition).  They stayed in Room 138.  ECF
No. 124-7, PageID.3511-12.  On July 25, 2016, John Fay turned on the
heat before they went to bed.  ECF No. 106-2, PageID.3062.  The Fays
were found unresponsive in their room by a housekeeper.  ECF No. 124-
6, PageID.3477 (police report); ECF No. 124-7, PageID.3489 (hotel GM
deposition).  Upon the arrival of emergency services, Warren Fire
Department personnel's carbon monoxide detectors recorded readings of
349 ppm.  ECF No. 123, PageID.3331 (fire department report).
According to the police report, the Fire Department advised personnel
at the scene that a reading over 200 ppm is potentially lethal.  ECF No.

3

124-6, PageID.3477.  The wing of the hotel was deemed unsafe and
evacuated.  ECF No. 124-6, PageID.3477.  The Fays were taken to the
hospital.  ECF No. 124-6, PageID.3477.[2]  Both John and Janice Fay
allege that they required emergency treatment at Detroit Receiving
Hospital, including hyperbaric oxygen treatment.  They allege that they
suffered permanent brain damage and are now permanently disabled as
a result of severe carbon monoxide poisoning.  ECF No. 123,
PageID.3270.

Although Defendant disputes that the cause of the carbon
monoxide is known, the police report at the time stated that a faulty
thermostat caused the AC to run continuously with the heating
element, which contributed to a quicker buildup of carbon monoxide and
that, along with "faulty duct work," caused their injuries.  ECF No. 123,
PageID.3336.  Plaintiffs largely adopt this theory via an expert report.
*See* ECF No. 123, PageID.3259-60.  As they put it: "This 'competition'
between the AC and the furnace allowed the furnace to fire for longer
intervals than one would expect during a warm summer night.  Of
course, longer furnace firing intervals would generate more carbon

---

[2] Their dog was also taken out of the room.  ECF No. 124-6, PageID.3477.

monoxide than the very short firing interval that would be necessary to bring the hotel room to comfortable temperatures if the furnace were not in competition with the AC."  ECF No. 123, PageID.3297.

The Fays allege that "Defendants failed to repair and maintain the furnace in accordance with the Michigan Mechanical Code."  ECF No. 123, PageID.3274.  Specifically, "Defendants merely changed the filters on the furnaces and occasionally changed the battery on the thermostat."  ECF No. 123, PageID.3278.  In their view, proper inspection of the furnaces would have been annual and would include "inspection of the burner and flue for signs of water and corrosion, inspection of the heat exchanger for signs of corrosion, and performance of a combustion analysis test."  ECF No. 123, PageID.3277.  They argue that "a licensed HVAC contractor, Dhia Sawa, inspected the furnace in Plaintiff's hotel room after the exposure event and testified that he saw rust on the burners and heat exchanger, and concluded that the heat exchanger was 'bad.' . . . [S]uch signs of corrosion on the burners and heat exchangers 'are a red flag for any qualified HVAC technician,' which would have been identified prior to the subject event had

inspection and maintenance been performed as required . . . ."  ECF No. 123, PageID.3278 (record citations omitted).

They also allege that although "[t]he International Fire Code, as adopted by the City of Warren and the State of Michigan (via incorporation into the Michigan Building Code) requires installation of single-station carbon monoxide alarms in rooms when there is a fuel-burning appliance[,]" "there were no carbon monoxide alarms or detectors in Plaintiff's room[.]"  ECF No. 123, PageID.3280.

Janice and John Fay now sue based on negligence and premises liability theories under Michigan law.  Warren Hospitality moves for summary judgment as to all of their claims; both Fays move for judgment as to liability.

## III.   STANDARD OF REVIEW

When a party files a motion for summary judgment, it must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . .; or (B) showing that the

materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).  The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)).  Furthermore, the evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The court's role is limited to determining whether there is a genuine dispute about a material fact, that is, if the evidence in the case "is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

Where the movant establishes the lack of a genuine issue of material fact, the burden of demonstrating the existence of such an issue shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*,

477 U.S. 317, 322–23 (1986). That is, the party opposing a motion for summary judgment must make an affirmative showing with proper evidence and to do so must "designate specific facts in affidavits, depositions, or other factual material showing 'evidence on which the jury could reasonably find for the plaintiff.'" *Brown v. Scott*, 329 F. Supp. 2d 905, 910 (6th Cir. 2004). In order to fulfill this burden, the non-moving party only needs to demonstrate the minimal standard that a jury could ostensibly find in his favor. *Anderson*, 477 U.S. at 248; *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). However, mere allegations or denials in the non-movant's pleadings will not satisfy this burden, nor will a mere scintilla of evidence supporting the non-moving party. *Anderson*, 477 U.S. at 248, 251.

## IV. ANALYSIS

This case is before the court on the basis of diversity jurisdiction under 28 U.S.C. § 1332, and Plaintiffs' claims are based entirely on state law. The task of this court, sitting in diversity, is to apply the same law as would be applied by the Michigan state courts. *See Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938). Where a state's highest court has spoken to an issue, this court is bound by that decision unless it is

convinced that the high court would overrule it if confronted with facts similar to those before it. *Bernhardt v. Polygraphic Co. of Am.*, 350 U.S. 198, 205 (1956). Moreover, where a state appellate court has resolved an issue to which the high court has not spoken, federal courts should "treat [those] decisions . . . as authoritative absent a strong showing that the state's highest court would decide the issue differently." *Garrett v. Akron-Cleveland Auto Rental, Inc. (In re Akron-Cleveland Auto Rental, Inc.)*, 921 F.2d 659, 662 (6th Cir. 1990). A tort claim filed in a Michigan court is generally governed by Michigan law. *Gass v. Marriott Hotel Servs.*, 558 F.3d 419, 425 (6th Cir. 2009) (citation omitted).

### A.    Premises Liability versus Ordinary Negligence

A significant point of disagreement between the parties is the form of the claim. Janice Fay advances the argument that her claim (and by extension, John Fay's claim) sounds in ordinary negligence. ECF No. 130, PageID.3872. Defendant argues that the claim sounds solely in premises liability. ECF No. 124, PageID.3348. John Fay stakes out a middle ground; Plaintiffs' claims sound in both negligence and premises liability. ECF No. 129, PageID.3645.

"Michigan law distinguishes between a claim of ordinary negligence and a claim premised on a condition of the land. Whether the gravamen of an action sounds in negligence or in premises liability is determined by considering the plaintiff's complaint as a whole, regardless of the labels attached to the allegations by the plaintiff." *Jeffrey-Moise v. Williamsburg Towne Houses Coop., Inc.*, 336 Mich. App. 616, 625 (2021) (citations omitted). "[A] claim of premises liability arises 'merely from the defendant's duty as an owner, possessor, or occupier of land.'" *Id.* at 626 (quoting *Lymon v. Freedland*, 314 Mich. App. 746, 756 (2016)). "When a plaintiff's injury arises from an allegedly dangerous condition on the land, the action sounds in premises liability rather than ordinary negligence, even when the plaintiff alleges that the premises possessor created the condition giving rise to the plaintiff's injury." *Compau v. Pioneer Res. Co., LLC*, 498 Mich. 928, 928 (2015) (citing *Buhalis v. Trinity Continuing Care Servs.*, 296 Mich. App. 685, 692 (2012)).

In contrast, "a claim of ordinary negligence is based on the underlying premise that a person has a duty to conform his or her conduct to an applicable standard of care when undertaking an

activity." *Jeffrey-Moise*, 336 Mich. App. at 624 (citing *Lymon*, 314 Mich. App. at 756).  Therefore, if a "plaintiff's claim is based on defendant's duty as the possessor of the land on which [the incident took place], and not upon defendant's ability to conform to a particular standard of care, [then Michigan courts] treat plaintiff's claim as one of premises liability." *Id.* at 625.  "A separate action for ordinary negligence emerges where a plaintiff alleges that injury resulted from an activity that is separate from the condition of the land." *Ramadan v. Home Depot, Inc.*, 504 F. Supp. 3d 695, 705 (citing *James v. Alberts*, 464 Mich. 12, 18-20 (2001)); *Pugno v. Blue Harvest Farms LLC*, 326 Mich. App. 1, 14 (2018) (indicating that a plaintiff proceeding on a theory of premises liability is not precluded from asserting "a separate claim [of ordinary negligence] grounded on an independent theory of liability based on the defendant's conduct") (quoting *Laier v. Kitchen*, 266 Mich. App. 482, 493 (2005)).  Said differently, "Plaintiffs can pursue claims in ordinary negligence for the overt acts of a landowner on his or her premises, and a claim in premises liability for the condition of a premises." *Gorsline v. Speedway LLC*, No. 16-cv-13002, 2017 U.S. Dist. LEXIS 149853, 2017

11

WL 4098828, at *5 (E.D. Mich. Sept. 15, 2017) (citing *Kachudas v.*
*Invaders Self Auto Wash, Inc.*, 486 Mich. 913, 913-14 (2010)).

Thus, the question here is whether plaintiff's claim about the
maintenance and inspection of furnaces, and the failure to place carbon
monoxide detectors in the room at issue is, as a matter of law, grounded
in the defendant's duty as a possessor of land and is a "condition of the
land," or grounded in the conduct of Defendant's employees or agents, or
potentially both.

The court recognizes that the line between "premises liability" and
"negligence" is not always clear.  "[T]he gravamen of the claim seems to
be in the eye of the beholder; some see *condition* where others see
*conduct*, making it difficult to predict how a particular set of facts will
be viewed by a court."  Ronald C. Wernette Jr. & Eric A. Rogers,
*Premises Liability vs. General Negligence in Michigan: Was Injury*
*Caused By Condition of the Premises Or Defendant's Conduct?*, 93 MI
BAR J. 26, 28 (2014) (emphasis in original).  Here, one could (as
Plaintiffs argue), conceive of the claim as grounded in Defendants'
*conduct* (i.e. their alleged failure to follow a particular standard of care
in conducting annual inspections, or preventing or alerting to carbon

monoxide leaks).  But it is easier to describe the issue as one grounded in a condition of the premises (the dangerous risk of an undetected CO leak due to the condition of the furnace and lack of CO detectors).  And among the cases the court has located that deal with carbon monoxide leaks, the trend appears to be to treat those claims as sounding in premises liability.  *See Greiner v. R & P Invs., Inc.*, No. 340619, 2019 Mich. App. LEXIS 1237, at *8 (Ct. App. Apr. 23, 2019) (case about carbon monoxide exposure as a result of the improper flue design in the laundry room of the leased premises sounded in premises liability, not negligence); *Sherman v. Israel Bros, Inc.*, No. 333514, 2018 Mich. App. LEXIS 2539, at *7 (Ct. App. May 24, 2018) (negligence claim based on carbon monoxide leak on leased premises interpreted as premises liability claim); *Brown v. Live Nation Worldwide, Inc.*, No. 365321, 2024 Mich. App. LEXIS 7569, at *8 (Ct. App. Sep. 27, 2024) (deaths from carbon monoxide emitted from a portable generator set up in front of a camper-trailer at a music festival sounded solely in premises liability); *Gibson v. Neelis*, 227 Mich. App. 187, 188 (1997) (carbon monoxide poisoning in apartment was premises liability action, though that claim was dismissed before appeal).  Earlier cases speaking in "negligence"

terms appear to pre-date the use of the specific term "premises liability" and in substance rely on premises liability standards (i.e. the duty of an invitor to his invitee).  *See Detroit City Gas Co. v. Syme*, 109 F.2d 366, 368 (6th Cir. 1940) (as to "negligence of the owner of the premises," "there is evidence that the vent flue from the gas heater passed through the ceiling of the bathroom and terminated in an enclosed attic, in violation of the Ordinances of the City of Detroit"); *Bradley v. Burdick Hotel Co.*, 306 Mich. 600, 604 (1943) ("where the proprietor of the premises has actual or constructive knowledge of the dangerous condition of an elevator," the question of "negligence" was properly put to the jury).[3]

Granted, many of these modern cases are nonbinding decisions of the Michigan Court of Appeals, and do not bind this court.  *See Whitmer*

---

[3] In the court's review of relevant cases, the term "premises liability" appears to have come into use by the Michigan Supreme Court sometime in the late 20th century.  *Compare Beals v. Walker*, 416 Mich. 469, 472 (1982) ("This is a slip and fall case which raises issues under the law of premises liability"), *and Merritt v. Nickelson*, 407 Mich. 544, 552 (1980) (using the term "premises liability" to refer to an invitor's duty), *with Keech v. Clements*, 303 Mich. 69, 72 (1942) (slip and fall put in terms of "negligence", but not using the term "premises liability"), *and Torma v. Montgomery Ward & Co.*, 336 Mich. 468, 472 (1953) (same), *and Quinlivan v. Great Atl. & Pac. Tea Co.*, 395 Mich. 244, 248 (1975) (same).  Older cases (roughly pre-1980) exclusively using the term "negligence" to refer to a claim regarding an invitor's duty of care are therefore not particularly persuasive as to how to categorize a claim under modern jurisprudence.

14

*v. Bd. of State Canvassers*, 337 Mich. App. 396, 408 n.3 (2021), *corrected on other grounds by* 2021 Mich. App. LEXIS 3401 ("MCR 7.215(C)(1) [] provides that unpublished decisions of this Court are not precedentially binding under principles of state decisis. They may, however, be consulted as persuasive authority."). They illustrate, however, a persuasive trend that the court joins. Plaintiffs' claims sound in premises liability.

Having found that the action sounds in premises liability, the only question is whether a claim for ordinary negligence may also lie. That answer must be no. Where courts have found both claims to be cognizable, there are distinct acts which give rise to possible liability, and contemporaneous, overt acts being done by a party. For example, in *Sundberg v. Oberstar, Inc.*, 2020 Mich. App. LEXIS 7550, *12 (Nov. 12, 2020), when a plaintiff entered an office building to arrange a webinar, she asked an employee where the bathroom was. The employee pointed to two doors; the plaintiff opened one and stepped through – only to discover there was no floor and fell to the basement, eight feet below. Her premises liability claim about the floorless room also supported an ordinary negligence claim for the employee's act of

15

directing her toward the drop-off and failure to intercede when they saw her headed toward peril. *Id.* And in *Cote v. Lowe's Home Ctr.*, 896 F. Supp. 2d 637 (E.D. Mich. 2012), a plaintiff was hit by a falling box when an employee was stacking boxes. *Id.* at 649. That claim too sounded in both premises liability and ordinary negligence based on the employee's actions. But in *Pugno v. Blue Harvest Farms LLC*, 326 Mich. App. 1 (2018), the plaintiff could not sue under both theories because the only negligence they alleged was the manner in which an employee had stacked pallets on a warehouse floor. Even though that could (perhaps) be fairly described as an employee's negligent conduct, the claim itself sounded only in premises liability: the duty to not create a hazardous condition on the land. *See id.* at 14-16. The passage of time rendered the manner of their stacking simply a condition of the premises. *See id.* at 16.

In this case, Plaintiffs' own briefs illustrate that any "conduct"-based duty of care arose solely from Defendant's duty as a landowner. ECF No. 123, PageID.3277 (Janice Fay) ("Under Michigan law, '[a]n innkeeper has a duty to protect guests from injury.'"); ECF No. 126, PageID.3531 (John Fay) (incorporating Janice's motion by reference).

16

Plaintiffs allege a premises liability claim because they seek to hold
Warren Hospitality liable due to a hazardous condition on the land and
based on Warren's duty as the owner or possessor of the land.
Plaintiffs' allegations center around the hazardous condition: the risk of
carbon monoxide leakage from an old, corroded furnace and the lack of
carbon monoxide detectors.  Their allegations involve the creation of the
condition and Warren's duty to protect them from it.  Their arguments
focus on Warren's alleged failure to maintain the premises in a
reasonably safe condition based on its role as the owner or possessor of
the land on which they were injured.  The claim sounds exclusively in
premises liability.  *See Saad v. Menards, Inc.*, No. 22-cv-11833,  2024
U.S. Dist. LEXIS 58540, at *19 (E.D. Mich. Mar. 29, 2024) (running
down a similar analysis).

   *Gass v. Marriott Hotel Services, Inc.*, 558 F.3d 419 (6th Cir. 2009),
cited by John Fay in his response to argue that both a negligence and
premises liability claim are cognizable in this case, is distinguishable on
this basis.  In *Gass*, the plaintiff hotel guests brought a negligence
claim, alleging they had been injured when the hotel contractor
negligently exposed them to pesticides inside their hotel room.  The

17

court said that a "jury reasonably could find that Defendants were negligent in inundating an occupied hotel room with pesticide spray in the absence of any warnings to the occupants." *Id* at 431.  But a contractor spraying pesticides into the room plaintiffs occupied is different from a malfunctioning furnace emitting poisonous gas.  The first is an overt, contemporaneous, negligent action done directly to the plaintiffs; the second is a downstream, indirect effect of potentially negligent care.  The second falls solely within Michigan's premises liability law: an action sounds in premises liability "even when the plaintiff alleges that the premises possessor created the condition giving rise to the plaintiff's injury." *Compau v. Pioneer Res. Co., LLC*, 498 Mich. 928, 928 (2015) (citation omitted).

## B.    Premises Liability Standard

In a Michigan premises liability action, a plaintiff must prove the elements of negligence: (1) the defendant owed the plaintiff a duty, (2) the defendant breached that duty, (3) the breach was the proximate cause of the plaintiff's injury, and (4) the plaintiff suffered damages. *Mouzon v. Achievable Visions*, 308 Mich. App. 415, 418 (2014) (citations omitted).

18

A landowner's duty to a visitor depends on whether the visitor is classified as a trespasser, licensee, or invitee. *Stitt v. Holland Abundant Life Fellowship*, 462 Mich 591, 596 (2000). The duty owed to invitees is well-established; "a possessor of land owes a duty to exercise reasonable care to protect invitees from dangerous conditions on the land. *Estate of Donna Livings v. Sage's Inv. Grp., LLC*, 507 Mich. 328, 337 (2021) (citing *Riddle v. McLouth Steel Prods. Corp.*, 440 Mich. 85, 90 (1992)). But invitors "are not insurers; that is, they are not charged with guaranteeing the safety of every person who comes onto their land." *Hoffner v Lanctoe*, 492 Mich. 450, 459 (2012). An invitor is liable if it "knows or should know of a dangerous condition on the premises of which the invitee is unaware and fails to fix the defect, guard against the defect, or warn the invitee of the defect. *Lowrey v. LMPS & LMPJ, Inc.*, 500 Mich. 1, 8 (2016) (citing *Hoffner*, 492 Mich. at 460).

At this stage, the court takes as a given that Plaintiffs suffered damages. On this summary judgment motion, Defendant may succeed if they prove that as to duty, breach, or causation, there are no remaining issues of material fact and they are entitled to judgment as a matter of law.

19

### C.   Duty

As to Plaintiffs' premises liability claims, "[d]uty is a threshold question of law[.]" *Kandil-Elsayed v. F & E Oil, Inc.*, 512 Mich. 95, 133 (2023).  There is no dispute that the Fays were invitees.  ECF No. 124, PageID.3358.  Therefore, Defendant owed plaintiffs a duty "to exercise reasonable care to protect [them] from an unreasonable risk of harm caused by a dangerous condition of the land."[4] *Kandil-Elsayed*, 512 Mich at 112 (quoting *Bertrand v. Alan Ford, Inc.*, 449 Mich 606, 609 (1995)).[5]

### D.   Breach does not depend on notice of this particular carbon monoxide leak

---

[4] At oral argument, counsel for John Fay suggested that a heightened duty of care applies to an innkeeper, and extends beyond the duty owed to an invitee.  The court does not think an innkeeper's duty is any different: an "innkeeper must exercise ordinary care and prudence to keep his premises reasonably safe for business invitees." *Upthegrove v. Myers*, 99 Mich. App. 776, 779 (1980).  And the analysis prior explains why the claims here sound in premises liability alone.

[5] To the extent that Defendant also argues that the Fays "failed to establish a duty" to "test for proper operation of furnaces on an annual basis' and to 'inspect[] the burner and flue for signs of water and corrosion,' the heat exchanger for 'signs of corrosion,' [or] to perform a 'combustion analysis test.'" and seeks summary judgment on that basis, those arguments were related to Plaintiffs' ordinary negligence claims and need not be addressed further.  ECF No. 127, PageID.3604; ECF No. 128, PageID.3637.  In the context of a premises liability claim, those kinds of arguments are more properly considered under the "breach" element; i.e. whether it breaches the duty of reasonable care to not undertake certain acts.

Other than the discussion of ordinary negligence versus premises liability, a fair bulk of the parties' motions for summary judgment relate to the question of breach.  Warren Hospitality notes (correctly) that for the element of breach of duty to an invitee, a breach "occurs if the premises owner knows or should have known of a dangerous condition and fails to protect invitees via repair, warning, or other appropriate mitigation of the danger under the given circumstances." *Albitus v. Greektown Casino, LLC*, 339 Mich. App. 557, 984 N.W.2d 511, 514–15 (2021) (internal citation omitted).  Warren's argument is that "Summary Judgment is appropriate because there is no genuine issue of fact that Plaintiffs have not and cannot prove either actual or constructive notice of the allegedly dangerous condition, the carbon monoxide leak, on Warren Hospitality's premises."  ECF No. 124, PageID.3359.  For example, in discussing constructive notice, Defendant argues "there is no evidence whatsoever that the leak extended for such a duration of time as to put Warren Hospitality on notice of an allegedly dangerous condition."  ECF No. 124, PageID.3362; *see Lowrey*, 500 Mich. at 11-12 (A defendant had constructive notice if

"the hazard was of such a character, or had existed for a sufficient time, that a reasonable premises possessor would have discovered it.").

As far as that argument focuses on Warren's lack of notice of the leak itself, that view and framing of actual and constructive notice is too narrow, and the court rejects it as a matter of law. At least in this portion of their argument, Defendant appears to be viewing the "dangerous condition" or hazard at issue as the carbon monoxide leak *that day*. And because Defendant did not discover the carbon monoxide until Plaintiffs' injuries had already occurred, they argue that they cannot be held liable. But it is more consistent with longstanding Michigan law to view the dangerous condition as the *risk that a serious carbon monoxide leak would occur and go undetected*, not this particular leak on this particular day.

The core of premises liability is an invitor's duty to maintain his property in a reasonably safe condition. *Riddle v. McLouth Steel Prods. Corp.*, 440 Mich. 85, 90 (1992) ("It is well settled in Michigan that a premises owner must maintain his or her property in a reasonably safe condition and has a duty to exercise due care to protect invitees from conditions that might result in injury"); *Hughes v. PMG Bldg., Inc.*, 227

Mich. App. 1, 10 (1997) ("An invitee is a person who enters the land of another on an invitation that carries with it an implication that the owner has taken reasonable care to prepare the premises and to make them safe.").  The idea is that "social policy imposes on possessors of land a legal duty to protect their invitees on the basis of the special relationship that exists between them.  The rationale for imposing liability is that the invitor is in a better position to control the safety aspects of his property when his invitees entrust their own protection to him while entering his property." *Bertrand v. Alan Ford, Inc.*, 449 Mich. 606, 609 (1995) (citation omitted).  Interpreting this standard to permit the buildup of an unreasonable risk of harm, so long as the inevitable resulting accident is not discovered by the premises owner before someone gets hurt, is inconsistent with the background social policy and the duty to maintain the property in a reasonably safe condition. *See Marion v. Grand Trunk W. R.R. Co.*, 513 Mich. 220, 236 (2024) (finding that *Riddle*'s statement "regarding the scope of a defendant's duty remain[s] valid").

Consider an analogy to a hotel fire.  Instead of (as here) a missing carbon monoxide alarm and an allegedly dysfunctional furnace and

thermostat, imagine a derelict hotel where no fire alarms have ever been installed, the sprinkler system has never been connected to water, and the electrical system is a matter of duct tape and dreams. An electrical fire inevitably breaks out one day, quickly spreads through a guestroom, and injures the guests sleeping therein. Would it really be consistent with a premises owner's duty of reasonable care to invitees to say that, because the hotel was not aware of *that specific fire* until it had burned out of control, no liability attaches for lack of notice? *See* ECF No. 124, PageID.3364 (arguing that here, Defendant "never detected any positive levels of carbon monoxide before the incident" and that "there is no evidence as to the duration of the carbon monoxide leak"). No. The better interpretation of existing law is that the hotel was on notice that their fire safety precautions were inadequate, that they were therefore on actual or constructive notice on any given day of a high risk of fire and injury to their guests, the risk of fire was likely not open and obvious to invitees, and liability may therefore attach. *See, e.g.*, *Estate of Martinez v. Frasca*, No. 338369, 2018 Mich. App. LEXIS 2679, at *14-15 (Ct. App. June 19, 2018) (in a case involving a house fire and death of a minor, question of notice depended not on the

fire itself but the history of electrical problems with the property and the functionality of smoke detectors); *McConnell v. Smith*, No. 200769, 1998 Mich. App. LEXIS 1677, at *5 (Ct. App. June 9, 1998) (premises liability for house fire and the death of four children turning on the parties' awareness of the "nonfunctioning smoke detectors" as the defect, not the fire itself); *Morris v. Fredenburg*, No. 186186, 1996 Mich. App. LEXIS 757, at *3 (Ct. App. Oct. 25, 1996) (notice as to an apartment fire turned on defendant's "actual or constructive notice or knowledge of the wiring defect" that caused the fire).

This concept is well-settled and can be traced to the 19th-century origins of Michigan's common law of premises liability. *See Lowrey v. LMPS & LMPJ, Inc.*, 500 Mich. 1, 8 (2016) (citing the duty of care as stated in *Hoffner v. Lanctoe*, 492 Mich. 450, 460 (2012) (citing the duty of care as stated in *Samuelson v. Cleveland Iron Mining Co.*, 49 Mich. 164, 170 (1882))). In *Samuelson*, a late 1800s case, a miner was killed in a roof collapse while working in an iron mine. "[T]he roof of said pit was of soap-stone, which was a dangerous rock for roof support, . . . liable at all times to crumble and fall, and [] the roof in question required constant care, attention and examination in order to keep the

same in a reasonably safe condition[.]" *Id.* at 168. "[T]o prevent [the roof] from falling on the workmen below, . . . supports and timbers ought to have been placed under it to make it safe, but defendant neglected and refused to place them; . . . [so] a large quantity of rock fell from said roof[.]" *Id.* The court stated the following rule: "If the mine were in an unsafe condition when it was handed over to the contractors, and this was known to defendant, or by the exercise of proper care ought to have been known, and if in consequence a miner who was brought there in ignorance of the danger was killed, the defendant should be held responsible. Every man who expressly or by implication invites others to come upon his premises, assumes to all who accept the invitation the duty to warn them of any danger in coming, which he knows of or ought to know of, and of which they are not aware." *Id.* at 170. The dangerous condition in that statement was not the falling or fallen roof at the moment it happened; the dangerous condition at issue was the allegedly unreasonably unsafe condition of the roof and the lack of precautions taken to support it. The danger of a mine collapse is analogous to the danger of a gas leak or a fire; the dangerous "condition" or "defect," for purposes of assigning liability to a premises

26

owner in these kinds of circumstances, is not the actual occurrence of

the dangerous thing (which may be quick, unstoppable, or undetectable

until it is too late), but the dangerous and unreasonable *risk* of that

event occurring.[6]  Plaintiffs make a similar point in distinguishing

cases with what they refer to as "transient" conditions versus an unsafe

condition that build over time to an unreasonable risk of sudden harm.

*See* ECF No. 129, PageID.3675.  John Fay cites, for example, *Thompson*

*v. Gibson*, No. 333755, 2018 WL 3551568 (Mich. Ct. App. July 24, 2018),

where a plaintiff was injured when the railing gave way on the

defendant's deck.  The issue of notice in that case is not whether the

defendant was on notice of the railing tearing loose at the time it

happened, but rather whether the defendant was aware over time that

the railing was in such a condition that it might give way at any

moment.  *See id.* at *11 (taking into account evidence of wear and tear

---

[6] Consider as well how the "dangerous condition" language is phrased: "If, for example, the dangerous conditions on the premises are hidden <u>or latent</u>, the premises owner is obliged to warn the invitee of the dangers."  *Bertrand v. Alan Ford, Inc.*, 449 Mich. 606, 613 (1995) (emphasis added); *see also Latent*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/latent (Latent: "present and capable of emerging or developing but not now visible, obvious, active, or symptomatic").  An unreasonably high risk of a carbon monoxide leak is a latent dangerous condition (i.e. not happening at this moment but capable of developing at any time).

that gave rise to the "reasonable inference that the deck's condition was gradually deteriorating").

In this case, the question of what Defendant knew or should have known thus is properly focused on the degree of risk posed by the condition of the furnace and the lack of a carbon monoxide detector in this particular room, and how long Defendant knew or should have known of that risk. As far as Defendant argues otherwise, their motion is denied. However, Defendant also makes a number of arguments that directly address the issues of whether they had actual or constructive notice of the risk of an undetected CO leak due to the condition of the furnace and the lack of CO detectors. The court turns to those issues.

## E.    Material disputes of fact remain as to breach and causation

There are three main parts to Plaintiffs' theory of how the carbon monoxide exposure occurred.

- First, a faulty furnace produced unsafe levels of carbon monoxide. *See* ECF No. 123, PageID.3259. The furnace, according to Plaintiffs, showed signs of corrosion on the burners and heat exchanger, which should have put Defendants on notice of a high risk of carbon monoxide generation (via incomplete combustion) and leakage (via flame rollout, where the flames exit the combustion chamber and exhaust products, including carbon

28

monoxide, enter the ambient air).  *See* ECF No. 123, PageID.3293-94, 3297.[7]

- Second, the room's faulty thermostat caused a more rapid buildup of carbon monoxide than would likely otherwise have occurred. ECF No. 123, PageID.3297.  The thermostat was stuck on the cooling element, causing the AC to run continuously.  *Id.*  As a result, when the Fays turned on the heat, the heating element ran continuously to counteract the AC rather than running only for a short burst.  *Id.*

- Third, a lack of carbon monoxide detectors caused there to be no alarm, which had they been present, would have prevented serious harm.  ECF No. 123, PageID.3273.[8]

The question of breach — "whether defendants' conduct in the particular case is below the general standard of care" — is generally a question of fact for the jury.  *Rowland v. Independence Village of Oxford, LLC*, 509 Mich. 992, 992 (2022) (quoting *Clark v Dalman*, 379 Mich. 251, 260-261 (1967)).  And "[g]enerally, the question of whether a

---

[7] Plaintiffs' expert also references the possibility of improperly vented exhaust from the furnace.  *See* ECF No. 123, PageID.3291.  However, he later in his report rules out the importance of that possibility and focuses only on the "flame rollout" explanation.  *Id.* at PageID.3297.  Plaintiffs accordingly do not press this "venting" explanation.

[8] Defendant also argues that Plaintiff claims a bird's nest in the flue caused the CO buildup.  Presumably, this is reference to earlier testimony possibly indicating evidence of a bird's nest.  *See* ECF No. 97 (Motion in Limine).  John Fay disclaims that in his response; Janice Fay does not address it.  The court treats the point as irrelevant or otherwise moot; Plaintiffs are not claiming that there was a bird's nest or that it was causally related to this event.  ECF No. 129, PageID.3658; ECF No. 97 (plaintiffs' motion seeking to exclude mention of a bird's nest).

defect has existed a sufficient length of time and under circumstances that the defendant is deemed to have notice is a question of fact, and not a question of law." *Banks v. Exxon Mobil Corp.*, 477 Mich. 983, 984 (2007) (citing *Kroll v. Katz*, 374 Mich. 364, 371 (1965)). This case falls comfortably within the general rule that breach is an issue of fact best suited for a jury. For the reasons explained below, genuine disputes of fact remain on which a reasonable jury could find for either side.

### i.    *Thermostat*

First, one point can be addressed up front. There is no real dispute (on this motion at least) that a faulty thermostat caused the AC to run continuously in the room, which contributed to the Fays turning on the heat and also kept the AC on even when the heat was turned on.[9] However, there is also no real dispute on this motion that Defendants did not, and could not reasonably have had, actual or constructive notice as to the thermostat's condition. *See* ECF No. 123,

---

[9] Defendant says Plaintiffs have no proof of this theory. ECF No. 124, PageID.3350; ECF No. 127, PageID.3590. But that is not true; although Plaintiffs did not attach their own testimony that their expert report refers to (*see* ECF No. 123, PageID.3297) the police report is itself admissible evidence as to both of these points, and it is Defendant who has presented no contrary evidence to meet their own burden of proof to show a material dispute of fact. *See* ECF No. 124-6, PageID.3477. The court takes Plaintiffs' version as established for purposes of the motion. Fed. R. Civ. P. 56(e)(2).

PageID.3278 ("Defendants breached the duty of care owed to Plaintiff in two key ways.") (explaining Defendant's alleged failure to maintain the furnace and the failure to put carbon monoxide detectors in the room, but not arguing that the thermostat violated the duty of care); ECF No. 124, PageID.3369 (there had been no complaints related to a faulty thermostat). Thus, while there is no material dispute on this motion that the faulty thermostat was a factual cause of the rapid build-up in CO in the room, there is also no dispute that this fact was not asserted on this motion as relevant to proving Defendant's liability. On the other hand, as far as Defendant's argument may at times indicate that the lack of notice of the thermostat's functionality is independently sufficient to defeat liability, the court disagrees. *See* ECF No. 124, PageID.3348. The type of harm that occurred was, accepting the facts in the light most favorable to Plaintiff, foreseeable. The fact that the extent of that harm (i.e. the sheer amount of CO and how quickly it built up) may have been reached unforeseen levels, at an unforeseen rate, or in combination with an intervening cause (the faulty thermostat), does not defeat liability as a matter of law so long as the dangerous condition of the furnace and risk of an undetected CO leak

remained a but-for and proximate cause of the event.  *See* Restatement
(Third) of Torts § 31 cmt. b (2010) (liability may attach even if "the
manner or mechanism by which the harm occurs is unusual," so long as
"the harm is still within the scope of the risk"); *see also McKown v.
Simon Prop. Grp., Inc.*, No. C08-5754BHS, 2011 U.S. Dist. LEXIS
29808, 2011 WL 1085891, at *4-5 (W.D. Wash. Mar. 22, 2011)
("The manner in which the risk culminates in harm may be unusual,
improbable and highly unexpectable, . . . .  And yet, if
the harm suffered falls within the general danger area, there may
be liability, provided other requisites of legal causation are present.")
(citing Restatement (Second) of Torts § 435); *Selleck v. Lake Shore & M.
S. R. Co.*, 93 Mich. 375, 381 (1892) (". . . the defendant is liable,
notwithstanding he may not have anticipated, or been bound to
anticipate, the interference of the superior force which, concurring with
his own negligence, produced the damage").

      *ii.    Lack of CO detectors*

     As Defendant admitted at oral argument, there is also no real
dispute that there was no carbon monoxide detector inside Room 138.
*See* ECF No. 123, PageID.3280.  There is no dispute at this stage that

the lack of CO detectors violated[10] Section 1103.9 of the International Fire Code, as adopted by the City of Warren and the Michigan Building Code, which requires that any building containing a fuel-burning appliance be equipped "with single station carbon monoxide alarms . . . installed and maintained in accordance with NFPA 720 and the manufacturer's instructions."[11]  This is evidence of breach of Defendant's duty of care to invitees.

However, this fact alone is insufficient to grant summary judgment to Plaintiffs.  As both parties pointed out, "[i]n Michigan, the violation of administrative rules and regulations is evidence of negligence, and therefore when a violation is properly pled it may be submitted to the jury[,]" but it is not conclusive.  *See Zalut v. Andersen*

---

[10] Or perhaps, "would violate."  Plaintiffs at times indicate that the regulation may not apply retroactively to this particular hotel.  *See* ECF No. 129, PageID.3674. Whether the regulation does or does not in fact require action of the hotel is not critical on this motion; the regulation is evidence of the appropriate standard of care and of negligence.

[11] *See* City of Warren Municipal Code, ch. 13 art. 1, Fire Prevention Code (Supplement 74, 2016), https://library.municode.com/mi/warren/codes/code_of_ordinances/269663?nodeId=P TIICOOR_CH13FIPRPR_ARTIFIPRCO_S13-2APINFICO [https://perma.cc/XYG9-DU99]; International Fire Code § 1103.9 (2012), https://codes.iccsafe.org/content/IFC2012/chapter-11-construction-requirements-for-existing-buildings#text-id-5443454 [https://perma.cc/Z86M-D3YN].

& *Assocs., Inc.*, 186 Mich. App. 229, 235 (1990); *Kennedy v. Great Atl. &*
*Pac. Tea Co.*, 274 Mich. App. 710, 720 (2007) (applying this rule in a
premises-liability case).[12]  "Even when a hazardous condition results
from a code violation, the critical inquiry is whether there is something
unusual about the alleged hazard that gives rise to an unreasonable
risk of harm.  If the proofs create a genuine issue of fact concerning
whether the risk of harm was unreasonable," the question of breach
"becomes a question for the trier of fact."  *See Kennedy*, 274 Mich. App.
at 720 (citations omitted, cleaned up).  Analogous to a lack of CO
detectors, a lack of functioning smoke detectors can evidence negligence
(or alternatively, their presence has been used to show lack of a
dangerous condition).  *Compare Estate of Martinez v. Frasca*, No.
338369, 2018 Mich. App. LEXIS 2679, 2018 WL 3039882, at *14-15 (Ct.
App. June 19, 2018) (no duty to warn of fire hazard because "there was

---

[12] John Fay also argued that this violation constitutes "negligence per se."
ECF No. 129, PageID.3674 (citing *Fisher v. Catahoula Parish Police Jury*, 165 So.3d
321 (La. App. 2015).  It is not entirely clear to the court what argument Plaintiff is
making with *Fisher* in this context, a Louisiana case whose majority opinion found
the defendant *lacked* notice and could not be held liable, but in any event
"negligence per se" as a form of strict liability is not recognized in Michigan.  *See*
*Mosley v. Marriot Int'l, Inc.*, No. 21-cv-10470, 2024 U.S. Dist. LEXIS 50505, at *32
(E.D. Mich. Mar. 21, 2024) (quoting *Campbell v. Nationstar Mortg.*, 611 F. App'x
288, 299 (6th Cir. 2015) ("Michigan does not adhere to the doctrine of negligence per
se.  Instead, the violation of a statute creates a rebuttable presumption of
negligence.") (citation omitted)).

no history or suspicion of any electrical problems with the property over the past four years" and "[w]hile one smoke detector was not functional at the time of the fire, three others were believed to be operable"), *with Samuels v. S. Hills Ltd. P'ship*, 289 F. Supp. 3d 26, 29 (D.D.C. 2017) (applying D.C. law, "a reasonable juror could conclude that a functioning smoke alarm would have given Plaintiff (or her daughter) earlier notice of the smoking oil *before* it reached an ignitable temperature and, correspondingly, that such earlier notice would have allowed Plaintiff to avoid injury.") (emphasis in original).

In the court's view, the failure to follow these administrative rules in placing carbon monoxide detectors in Defendant's hotel rooms is evidence of negligence – but whether that alone created an unreasonable risk of harm, or whether it did so when combined with the other alleged breaches of the duty of care, are issues more properly weighed by a jury.[13]

---

[13] Defendants also argue that "administrative codes and other regulations are only relevant to the case if '(1) the regulation is intended to protect against the injury involved; (2) the plaintiff is within the class intended to be protected by the regulation; and (3) the evidence will support a finding that the violation was a proximate cause of the injury involved.'" ECF No. 127, PageID.3604-05 (citing *Est. of Goodwin by Goodwin v. Nw. Michigan Fair Ass'n*, 923 N.W.2d 894, 919 (2018) (internal citation omitted)). According to them, Plaintiffs "did not even try to meet those requirements in [their] motion[s], nor can [they] even do so, as there is no

This issue of the lack of CO detectors is also more appropriately weighed by a jury as to the element of causation, and on this topic the jury can weigh the value of Defendant's explanation that they had maintenance technicians "smell" for gas when they entered guest rooms and took CO detectors with them on annual inspections (and Plaintiffs can argue whether the smell of gas being present at a given moment, or at a particular time annually, has anything to do with predicting the likelihood of a CO leak occurring at other times). *See* ECF No. 124, PageID.3351, 3354. As to causation, Defendant claims that "no one knows how long the furnace was running before carbon monoxide levels rose," so there is no proof "that carbon monoxide protectors would have prevented the claimed injury." ECF No. 128, PageID.3642. But a reasonable jury's exercise of common sense could result in the conclusion that a CO detector would have, regardless of the exact amount of time the leak was occurring, notified the occupants of the

---

evidence that the lack of carbon monoxide detector or that the purported lack of maintenance on the subject furnace or thermostat was the proximate cause of [their] injuries." ECF No. 127, PageID.3605. It is, frankly, self-evident that regulations requiring carbon monoxide detectors in buildings like hotels are intended to protect against carbon monoxide poisoning of hotel guests such as the Fays, and that the lack of carbon monoxide detectors may be a proximate cause of carbon monoxide poisoning. The failure to follow relevant regulations are relevant evidence of negligence in this case, and the argument is not well-taken.

abnormally high levels of CO in the room before the time the fire

department took a reading and in time to prevent some amount of

injury.  A jury could thus draw the conclusion that the lack of CO

detectors was a proximate and but-for cause of Plaintiffs' injuries.

### iii.   Maintenance and inspection of the furnace

This leaves the briefing surrounding the maintenance and

inspection of the furnace.  Plaintiffs, relying fairly heavily on two expert

reports, and particularly the report of Chris Damm, argue that the

furnace in the Fays' room was 29 years old.  ECF No. 123, PageID.3271.

According to them, the furnace was corroded and past its intended

lifespan.  ECF No. 123, PageID.3294 (indicating life expectancy 18

years, corrosion increases with age, and corroded burners increase risk

of CO generation).  Corrosion of the burners and other components

within the furnace led to compromised mixing of air and fuel, resulting

in incomplete combustion and carbon monoxide generation.  ECF No.

123, PageID.3271.  The carbon monoxide in the room was then

produced by flame rollout as a result of the corroded heat exchanger.

Flame rollout is when 'the burner flames exit the combustion chamber

and instead 'rollout' toward the front of the furnace . . . caused by the

flame and exhaust flow following the path of least resistance to flow.'"
ECF No. 123, PageID.3259.  Plaintiffs argue that the "corrosion and
fouling of the heat exchanger are issues that would have been easily
detected by a qualified HVAC contractor during annual preventative
maintenance of the furnace."  ECF No. 123, PageID.3272 (emphasis
omitted).  They say that "Defendants merely changed the filters on the
furnaces and occasionally changed the battery on the thermostat, which
does not meet the duty of care to inspect as set forth in City of Warren
code and the Michigan Mechanical Code."  ECF No. 123, PageID.3278
(citing ECF No. 124-3, PageID.3447 (testimony of a maintenance
employee that he would only change the furnace filter and thermostat
battery)).

Defendant argues that they are not required to bring forward
evidence of regular inspection to prove they took reasonable care.  *See*
*Grimwood v. Am. Airlines, Inc.*, 323 F. Supp. 3d 928, 934 (E.D. Mich.
2018) ("The Michigan Supreme Court 'has never required a defendant
to present evidence of a routine or reasonable inspection . . . to prove a
premises owner's lack of constructive notice of a dangerous condition on
its property.'") (quoting *Lowrey*, 500 Mich. at 10).  And that would be

38

true if Plaintiff had not brought enough evidence forward to create a
question of fact on notice. *See Albitus v. Greektown Casino, LLC*, 339
Mich. App. 557, 564 (2021).

But the duty of premises owners to inspect for dangers on behalf
of invitees is a longstanding principle of Michigan law. *See, e.g.*, *Price v
Kroger Co of Mich*, 284 Mich. App. 496, 500 (2009) (noting that a
property owner owes business invitees a duty to inspect the premises
for hazards that might cause injury); *Albitus*, 339 Mich. App. at 563.
Here, there is a question of fact as to actual or constructive notice
because Plaintiffs have presented evidence that the character of the
condition was such that it was or should have been discovered on
reasonable inspection, and thus evidence related to the extent and
quality of Defendant's inspection efforts is relevant to negating an
essential element of Plaintiffs' claims. *See Lowrey*, 500 Mich. at 11-12;
*Albitus*, 339 Mich. App. at 563 (2021) (noting *Lowrey* did not "dispens[e]
with the duty to inspect").

Defendants also take a different view of the facts. They argue
that there is "no evidence that anyone at Warren Hospitality knew
about any conditions that could lead to the July 2016 purported carbon

39

monoxide leak in Room 138." ECF No. 124, PageID.3352.  They recharacterize the work the maintenance men did: "Maintenance men at Hawthorne Suites did annual inspections of the furnaces in September or October." *Id.* (citing ECF No. 124-7, PageID.3500 (testimony that the City of Warren did annual inspections); ECF No. 124-3, PageID.3454 (testimony of maintenance worker regarding the annual check or inspection of furnaces).  They argue the maintenance workers took a CO detector with them on their annual rounds, and no CO readings were detected the prior September/October.  ECF No. 124, PageID.3360 (citing ECF No. 124-3, PageID.3447, 3454).  They point out that they received no prior complaints about CO leaks, including from Plaintiffs.  ECF No. 124, PageID.3361.  They dispute that anything was wrong with the furnace at all: Chief Mechanical Inspector for the City of Warren, Kurt Davis, "who inspected the furnace in Room 138 the day after the incident, noted that while the furnace was old, nothing looked broken or damaged other than the fire department had taken the tops off the vent." ECF No. 124, PageID.3354 (citing ECF No. 124-2, PageID.3383-84) (Davis Dep.).  And even if any rust/corrosion was present on the furnace in the room, they dispute that corrosion on a

heat exchanger necessarily leads to a risk of carbon monoxide
generation, and thus dispute causation as well.  ECF No. 124,
PageID.3355; ECF No. 128, PageID.3642.

These all sound in factual disputes unsuitable for summary
judgment.  For example, contrary to Davis' statement about the
condition of the furnace, Plaintiffs point to the testimony of "a licensed
HVAC contractor, Dhia Sawa," who "inspected the furnace in Plaintiff's
hotel room after the exposure event and testified that he saw rust on
the burners and heat exchanger, and concluded that the heat exchanger
was 'bad.' . . . [S]uch signs of corrosion on the burners and heat
exchangers 'are a red flag for any qualified HVAC technician,' which
would have been identified prior to the subject event had inspection and
maintenance been performed as required . . . ."  ECF No. 123,
PageID.3278 (record citations omitted).  While Defendant questions
Sawa's credentials (*e.g.* ECF No. 127, PageID.3597), their point goes to
credibility and weight, not admissibility or materiality.  And
Defendant's competing testimony from other individuals who saw the
furnace merely reflects a dispute of fact supported by testimony on both
sides, and not one so overwhelmingly lopsided as to require summary

judgment.  As to the annual "inspections" Defendant alleges, the court
has already noted that there are factual questions as to the sufficiency
of those annual checks.  *See* ECF No. 124-3, PageID.3447 (testimony of
the maintenance employee who performed the annual "inspections" that
he would only change the furnace filter and thermostat battery); *id.* at
PageID.34444 (testimony of same employee that he did not "understand
anything in" the area of heating, ventilating, and air conditioning); ECF
No. 130, PageID.3891 (Plaintiff's expert explaining why that does not
comport with the City of Warren and Michigan Mechanical Code
because inspections ought to include inspecting the burners, combustion
chamber, and heat exchanger for deterioration, among other problems).
It is for this reason that Defendant's evidence that supposedly shows
that their annual inspections were adequate reflects a material dispute
of fact; it is the jury's province to credit particular witnesses or not, and
what weight to accord their testimony.  *See* ECF No. 127, PageID.3593
(citing ECF No. 93-4, Laith Deposition, PageID.1241, ECF No. 93-8,
Deposition of Abdulnoor, PageID.1295; 1297; 1299-1300).  Again, a jury
can also better review Defendant's assertion that they met the
applicable standard of care by having housekeepers let a supervisor

know "if they smell anything" as a method of discovering problems with the furnace; for its part, the court does not find the point convincing enough that it takes the matter out of contention.  ECF No. 128, PageID.3626.[14]

A great deal of the dispute between the parties centers on whether Plaintiffs' two expert reports are admissible evidence at the summary judgment stage at all, and whether their experts may testify to all of the opinions offered in these motions.  If a motion to exclude relating to expert evidentiary disputes is filed at the summary judgment stage, the court is not required to decide the issue if the parties do not rely on the report or testimony, either in the motion or in any opposition.  *SEC v. Live Ventures Inc.*, No. 2:21-CV-1433, 2025 U.S. Dist. LEXIS 185459, at *7 (D. Nev. Sep. 22, 2025) (citing *Audionics Sys., Inc. v. AAMP of Fla., Inc.*, No. 1210763, 2015 U.S. Dist. LEXIS 180218, 2015 WL 12712288, at *17 (C.D. Cal. July 10, 2015) (stating it would be "a purely academic exercise" to rule on a motion to exclude when summary judgment movant did not cite disputed expert report)).  However, in this case,

---

[14] And as for the method of annually testing for CO, according to Damm: "Mr. Hanna's method of measuring [ambient] levels of CO in hotel rooms is almost meaningless in terms of ensuring that the furnaces are safe."  ECF No. 130, PageID.3892.

Plaintiffs cite fairly extensively to the Damm report, and make at least a few relevant references to the Colbert report, and so a determination is warranted as to whether the admissibility of the reports must be decided at this stage.

### 1.    *Standard for admissibility of expert testimony*

Federal Rule of Evidence 702 controls the admissibility of expert testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> >
> > (b) the testimony is based on sufficient facts or data;
> >
> > (c) the testimony is the product of reliable principles and methods; and
> >
> > (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Recent amendments to Rule 702 have clarified the reliability standard for expert testimony as well as the gatekeeping role of the trial court: "many courts have held that the critical questions of the

sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility.  These rulings are . . . incorrect."  Fed. R. Evid. 702 advisory committee's note to 2023 amendment.  Expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony is admissible.  *Id.*  But that does not mean that all challenges to expert testimony are challenges to admissibility.  If, for example, the court finds by the preponderance of the evidence that an expert has a sufficient basis to support an opinion, "the fact that the expert has not read every single study that exists will raise a question of weight and not admissibility."  *Id.*  As the committee further cautions, "proponents do not have to demonstrate. . . that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable. . . .  The evidentiary requirement of reliability is lower than the merits standard of correctness."  *Id.* (cleaned up).

District courts enjoy broad discretion "over matters regarding the admissibility of evidence at trial."  *Lockard v. Bray*, 602 F. Supp. 3d 998, 1005 (E.D. Mich. 2022) (citing *United States v. Seago*, 930 F.2d

482, 494 (6th Cir. 1991)).  Rule 702 does not require anything

approaching absolute certainty, just "knowledge;" thus, a district court

has discretion over where to draw the line between mere speculation

and knowledge.  *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 671-72 (6th

Cir. 2010).

### 2.   *Admissibility of the Colbert Report*

The Colbert Report is easier to deal with at this juncture.  Colbert

has experience in hotel management, among other topics.  *See* ECF No.

123, PageID.3322-25.  Plaintiffs use his report to provide an opinion on

"the manner by which Defendants breached the duty of care owed to

Plaintiff."  ECF No. 123, PageID.3273.  They note that Colbert

"criticized the Defendants' failure to install carbon monoxide detection

within the guest rooms at Hawthorn Suites in light of the fact the hotel

rooms held fuel burning equipment."  *Id.*  He also "criticized the

Defendants failure to provide and enforce their License Agreement and

Brand Standards, which include the regular and ongoing repair and

maintenance of guest room furnaces and equipment infrastructure.  *Id.*

at 3274.  He "opined that the evidence in this case demonstrates that

Defendants failed to repair and maintain the furnace in accordance

with the Michigan Mechanical Code[.]" *Id.* He opined that "Defendants failed to employ a competent manager and competent repair and maintenance employee responsible for maintaining the in-room furnaces as supported by deposition testimony provided by Defendants' employee." *Id.* He also opines that "the events in this case were preventable and foreseeable." *Id.*; *see also* ECF No. 123, PageID.3304-28 (Colbert report).

Some of Colbert's report relies on Damm's report. *See* ECF No. 123, PageID.3319. The fact that it does so is not inherently suspect. Courts frequently have pointed to an expert's reliance on the reports of others as an indication that their testimony is reliable. *Walker v. Soo Line R. Co.*, 208 F.3d 581, 588 (7th Cir. 2000) (collecting cases). "[W]hen an expert relies on the opinion of another, such reliance goes to the weight, not to the admissibility of the expert's opinion." *Ferrara & DiMercurio v. St. Paul Mercury Ins. Co.*, 240 F.3d 1, 9 (1st Cir. 2001); *Wisconsin v. Indivior, Inc. (In re Suboxone)*, No. 2445, 2021 U.S. Dist. LEXIS 30909, 2021 WL 662292, at *43 (E.D. Pa. Feb. 19, 2021) ("Experts may use a mix of objective data and subjective analysis from another expert to create an admissible report, and the testifying

expert's knowledge regarding the underlying facts goes to the weight accorded to that expert's report and testimony, rather than its admissibility.") (cleaned up); *Nusbaum v. Enlighten Family Chiropractic, LLC*, No. 19-cv-10223, 2023 U.S. Dist. LEXIS 9403, at *28 (E.D. Mich. Jan. 19, 2023) ("[A]n expert's testimony may be formulated by the use of the facts, data, and conclusions of other experts.") (quoting citation omitted). However, although "experts may generally rely on other expert reports, they must still conduct some amount of independent analysis and cannot 'merely regurgitate another expert's opinion.'" *Hill v. Med. Device Bus. Servs.*, No. 24-5797, 2025 LX 231991, 2025 WL 1950300, at *19 (6th Cir. July 16, 2025) (quoting citation omitted); *see also Mike's Train House, Inc. v. Lionel, LLC*, 472 F.3d 398, 408-09 (6th Cir. 2006), *abrogated on other grounds by A.K. v. Durham Sch. Servs., LP*, 969 F.3d 625 (6th Cir. 2020). The extent to which an opinion does so may affect its admissibility. *See Craton v. Birds Eye Foods, Inc.*, No. 1:10-cv-541, 2013 U.S. Dist. LEXIS 203608, 2013 WL 12421822, at *10 (W.D. Mich. Dec. 20, 2013) (admitting expert testimony based partially on other experts and distinguishing those cases "when an expert effectively stands in the place of another expert

48

and conveys the non-testifying expert's conclusions . . . or when their extensive reliance on the work of another expert renders their opinion a mere copy or derivative of the non-testifying expert's work"); *Smartrend Mfg. Grp. SMG, Inc. v. Opti-Luxx, Inc.*, No. 1:22-cv-915, 2023 LX 76418, 2023 WL 9058399, at *5 (W.D. Mich. Oct. 25, 2023) ("While an expert may be permitted under Rule 703 to *consider* the opinions of other experts in reaching a conclusion, an expert may not wholly base his own opinion on the opinion of another."). Contrary to Defendant's argument, the court is not convinced that Colbert is merely "regurgitating" Damm's work; Colbert takes Damm's conclusions as true, and then apparently evaluates what those conclusions reveal about Defendant's inspection practices according to what he says are industry standard, an evaluation that is slightly different from the one Damm provided and is based on Colbert's own expertise. Defendants base their argument to exclude Colbert's opinion entirely on the claim that "any testimony by Britton Colbert that relies on the speculation of Chris Damm must also be excluded." ECF No. 140, PageID.4034. As explained below, the court does not find Damm's opinion speculative. Colbert's reliance on Damm's opinions, therefore, goes to weight and not

admissibility, so this ground is not sufficient to exclude Colbert's

testimony.[15]

### 3.   *Admissibility of the Damm Report*

Damm's opinions require more detailed analysis at this stage,

because Plaintiffs heavily rely on his opinions in their motions, and the

briefing on Defendant's motion to exclude expert testimony focuses on

his report.  *See* ECF No. 140.  In particular, Damm's opinion appears to

be the only evidence providing the necessary logical step that the

corrosion that was allegedly observable on the furnace at issue was a

but-for cause of the CO generation and flame rollout.  Without that

evidence, Plaintiffs cannot show that the maintenance and inspection of

---

[15] Because Defendant's argument to exclude Colbert's opinion only relates to his reliance on Damm's report, the court largely leaves it at that for now.  But the court points out that Rule 702 has been read to counsel against allowing expert witnesses from testifying to broad legal conclusions.  *See United States v. Melcher*, 672 F. App'x 547, 552 (6th Cir. 2016); *United States v. Nixon*, 694 F.3d 623, 631 (6th Cir. 2012) (noting, however, that Fed. R. Evid. 704 does not prohibit experts from opining on "ultimate issues").  An expert offers a legal conclusion when he defines the governing legal standard or applies the standard to the facts of the case.  *See Torres v. Cty. of Oakland*, 758 F.2d 147, 150-51 (6th Cir. 1985).  Without prejudging the issue, some portions of Colbert's report might be questioned under that view.  *See, e.g.*, ECF No. 123, PageID.3317 (defining and offering opinions on what was "foreseeable").  On the other hand, it is also possible that at least some amount of Colbert's personal experience in hotel management would be helpful to the trier of fact in understanding, for example, accepted industry best practices and standards.  *See, e.g.*, ECF No. 123, PageID.3318-19.  For purposes of summary judgment and without the benefit of briefing, the court does not find any remaining issues of Colbert's testimony to be necessary to decide at this juncture.

the furnace is relevant to proving constructive notice. Otherwise, the mere existence of furnace corrosion is not sufficient to draw a causal connection to excessive carbon monoxide generation; such an inference would be speculative without evidence the two are related. The court ordered supplemental briefing on the Damm report because the parties' original briefs did not clearly address the issue and/or relied on briefing filed by prior attorneys. The parties filed updated briefs after oral argument. ECF Nos. 140 (Defendant's brief); 142 (Janice Fay's brief); 143 (John Fay's brief).

Damm has a PhD in mechanical engineering and has been a faculty member at the Milwaukee School of Engineering (MSOE) for the past 17 years. ECF No. 123, PageID.3302. Defendants seek to exclude Damm's testimony on four bases:

1) Damm admits that it is possible for rust to be present without causing carbon monoxide.

2) Damm did not observe or inspect the subject furnace or the room configuration at the time of the incident and so does not know how much corrosion was present.

3) Damm does not know how long the furnace or air conditioning were running.

4) Damm renders opinions on notice in his supplemental report despite admitting that he does not think he has ever been qualified to give an opinion on notice.

51

ECF No. 140, PageID.4010.

None provide a reason to exclude Damm's testimony.

First, Defendant argues that Damm admits that rust/corrosion can be present on a furnace without generating carbon monoxide, and therefore his opinion regarding causation is speculative. ECF No. 140, PageID.4028; *see* ECF No. 142, PageID.4259 (excerpts of Damm Report). But this point goes to weight, not admissibility. Damm's report explains why the presence of corrosion does not always lead to elevated CO and flame rollout, and why he nonetheless opines that corrosion is his prime suspect here. *See* ECF No. 123, PageID.3298. This explanation of possible alternatives and landing on one most likely explanation is not speculation. *See Jahn v. Equine Servs., PSC*, 233 F.3d 382, 390 (6th Cir. 2000) ("The fact that several possible causes might remain 'uneliminated' . . . only goes to the accuracy of the conclusion, not to the soundness of the methodology.") (citation omitted); *In re Flint Water Cases.*, No. 5:16-cv-10444-JEL-EAS, 2024 U.S. Dist. LEXIS 89711, 2024 WL 2244871, at *42 (E.D. Mich. May 17, 2024) ("it is uncontroversial that . . . experts need not rule out every conceivable alternative cause"). As long as Damm's opinion is

sufficiently trustworthy that rust/corrosion can be a cause of flame

rollout and carbon monoxide generation – and it meets that minimum

threshold of reliability – the commonality of that occurrence or the

likelihood of that explanation being true in this instance are questions

better explored on cross examination.

Second, Defendant argues that Damm's opinions are speculative

because he did not observe the actual furnace at issue, but relies on his

inspection of other furnaces on site and deposition testimony.  As far as

Damm's report relies on others' testimony, it is not improper for

an expert to rely on a party's deposition in forming his analysis.  *Fed.*

*Express Corp. v. Accu-Sort Sys.*, No. 01-2503, 2006 U.S. Dist. LEXIS

102870, at \*19 (W.D. Tenn. Jan. 13, 2006); *Figueroa v. Bos. Sci. Corp.*,

254 F. Supp. 2d 361, 367 (S.D.N.Y. 2003).  Defendant also argues that

the underlying testimony is not reliable: "Damm also bases his flame

rollout opinion on the testimony of Dhia Sawa," which is not reliable

"because Sawa did not have experience with furnaces and did not

identify how much corrosion was actually present."  *See* ECF No. 140,

PageID.4032.  But Damm relied on statements that Sawa made in his

deposition that after he saw the subject furnace, Sawa saw "a lot" of

rust on the heat exchanger, and testified that "that's how you know there is a big chance the heat exchanger is bad."  ECF No. 124-5, PageID.3466; ECF No. 123, PageID.3293.  And Sawa, at least in Plaintiffs' eyes, was an experienced HVAC technician whose testimony was corroborated by another witness.  *See* ECF No. 142, PageID.4264. His underlying testimony was sufficiently reliable for Damm to rely on; the differing interpretations of Sawa's testimony and the extent of Sawa's expertise on the things he personally observed are issues of credibility and weight, not of sufficiency at summary judgment. Damm's reliance on Sawa's testimony is likewise an issue of weight and credibility, not of sufficiency.

Meanwhile, as far as Damm used on-site inspections to identify similar furnace setups in other rooms at the hotel and to estimate the age of the furnace at issue, the court sees nothing plainly improper in doing so.  Although Defendant objects to Damm's lack of inspection of the actual furnace or thermostat in the room, it is not clear to the court that this argument places the matter beyond factual dispute, and under the circumstances of this case, Damm's reliance on similarly situated rooms and other furnaces at the same hotel was not so improper as to

54

require exclusion of his testimony entirely.  Damm's report states, and the parties agree, that Defendants did not preserve the original thermostat or furnace as evidence.  ECF No. 123, PageID.3286.  The parties' competing explanations of why Damm was unable to review those components is a matter of weight and credibility that should be considered by a jury; Defendant's repeated insistence that their own failure to preserve evidence renders Plaintiff's theories speculative may ring somewhat hypocritical to a reasonable juror.

Third, Defendant seeks to bar Damm's opinion that "the furnace achieved run times long enough to produce 400 ppm [parts per million] in the hotel room because 'there was concurrent heating and air conditioning occurring in the room.'"  ECF No. 140, PageID.4032 (record citation omitted).  They point out that Damm bases this opinion on a statement in the police report that the heat and air conditioning ran at the same time.  ECF No. 123, PageID.3296.  Having reviewed the report, the opinion is not speculative.  It is, perhaps, based on a series of inferential steps: thermostats can become stuck on either heating or cooling; it was apparently unusual that the concentration of CO in the room became so high so quickly; Plaintiffs' own testimony indicated the

heat was turned on; furnaces can generate CO under certain conditions; and a likely explanation for why the heating element would continuously run on a warm summer night long enough to generate such a high concentration of CO would be to counteract an air conditioning system that was stuck on cooling.  Damm's reliance on the police report as evidence for the final one of those steps – that a fire inspector reported that a problem with the thermostat caused the AC and heat to run concurrently – was not plainly improper.  *Cf.* Fed. R. Evid. 803(8) (public records exception to rule against hearsay).  The opinion of how the AC and heating elements ran continuously (and that they did so at all) is based on sufficient facts, data, and reliable principles that it is admissible.

Fourth, Damm did not admit that he was unqualified to opine on constructive notice.  In his deposition, Damm was asked "have you ever been qualified to give an opinion on notice?"  His answer was, "I don't think so."  ECF No. 93-3, PageID.1119.  Defendant argues that is sufficient to render his opinion inadmissible under Fed. R. Evid. 702.  But that was an ambiguous answer to the issue of whether he is (present-tense) qualified to opine in this case, so the court does not

think this single answer sufficient to bar his testimony.  On review of the context of the question, he seems to be referencing earlier questions about his history as an expert witness and that he had never testified in court as an expert witness on "notice" specifically, not that he is unqualified to do so here.  *See* ECF No. 140-3, PageID.4099, 4068.  To the contrary, another court in this district recently credited Damm's expertise on similar topics to those presented in this case.  *See Hous. Enter. Ins. Co. v. Hope Park Homes Ltd.*, 446 F. Supp. 3d 229, 245 (E.D. Mich. 2020).  His experience in the field was moreover not rebutted. *See* ECF No. 142, PageID.4270.

The court finds that is more likely than not that Damm's opinion meets the requirements of Rule 702, so any questions on the weight to be given to his opinions are best suited for a jury.  The questions posed by the Defendants, such as the degree of risk of CO generation by rust on the furnace burners and the likelihood of Damm's hypothesis being correct, go to credibility and not admissibility; the opinion has sufficient indicia of reliability to require submission to a jury.  The consequence of permitting Damm's opinion to be presented to the jury is straightforward: a material dispute of fact exists as to whether

Defendant's maintenance and inspection of the furnace should have, either independently or together with the lack of CO detectors, put Defendant on constructive notice of the dangerous risk of an undetected CO leak occurring.

   *iv.* *Causation*

  The above discussion also heavily bears on the causation element. Proximate cause includes two separate elements: (1) cause in fact, which requires a showing that but for the defendant's conduct, the plaintiff would not have been injured, and (2) legal or proximate cause, which involves examination of the foreseeability of consequences and whether a defendant should be held legally responsible for those consequences. *Skinner v. Square D. Co.*, 445 Mich. 153, 162-163 (1994). "The issue of proximate cause is generally a question of fact[.]" *Meek v. Dep't of Transportation*, 240 Mich. App. 105, 115 (2000), *overruled on other grounds by Grimes v. Dep't of Transportation*, 475 Mich. 72 (2006).

  In this case, the facts bearing on proximate cause are in dispute, and reasonable minds could differ as to how to apply the concept of proximate cause to these facts.  A jury could conclude that the furnace was old, corroded, in desperate and obvious need of repair, and the

failure to repair or replace the furnace was the but for and legal

proximate cause of the carbon monoxide leak and the Fays' injuries.  A

jury could also conclude that the evidence regarding the furnace's state

of disrepair is not convincing, or that the furnace's state of disrepair did

not put Defendant on notice that a carbon monoxide leak was likely, or

that the furnace was not a but-for cause of Plaintiffs' injuries and the

lack of CO detectors was not a breach of Defendant's duty.  Material

disputes of fact remain as to causation, and these disputes, tied up as

they are with the factual disputes as to breach, are best left for a jury to

decide.

### v.    Conclusion

Cases dealing with carbon monoxide leaks confirm that these

kinds of disputes are ones that are often unsuitable for summary

judgment.  *See Sherman v. Israel Bros, Inc.*, No. 333514, 2018 Mich.

App. LEXIS 2539, 2018 WL 2370482, at \*7 (Ct. App. May 24, 2018)

(regarding a carbon monoxide leak, finding a "genuine issue of material

of fact regarding whether defendant could have discovered, on casual

inspection, that the water tank's 'vent connector' was corroded, and that

defendant therefore should have been aware of the risk of a carbon

monoxide leak"). That court found: "Plaintiffs presented the trial court with photographs taken of the water tank following the August 26, 2013 incident, asserting that the photographs demonstrate that the defective nature of the water tank and duct work would have been noticed by defendant during a casual inspection." *Id.* Similarly, here Plaintiffs have presented evidence that the furnace was corroded, that the allegedly defective condition of the furnace should have been noticed by Defendant during a proper inspection by a person experienced in furnace repair. Analogously, in *Greiner v. R & P Invs., Inc.*, No. 340619, 2019 Mich. App. LEXIS 1237, 2019 WL 1780972 (Ct. App. Apr. 23, 2019) (a case about carbon monoxide exposure as a result of the improper flue design in the laundry room), the Michigan Court of Appeals found no breach as a matter of law. That court said, "plaintiffs did not present any evidence demonstrating that the permit process would have revealed the potentially dangerous condition of the flue design. Although Juhasz initially averred that the flue design did not comply with applicable building codes, she removed that assertion from her later affidavit." *Id.* at *8. This suggests that had the plaintiffs in that case presented evidence about the failure to comply with applicable

codes, a question of fact would have been raised.[16]  Here, there is no

dispute that there were no carbon monoxide detectors in apparent

violation of applicable codes; a jury could consider the lack of CO

detectors, either independently or in conjunction with other factors, to

have put Defendant on notice of the dangerous condition in the room.

In sum, in the light most favorable to Plaintiffs, a reasonable jury

could conclude that the risk of an undetected CO leak due to the

furnace's condition and/or lack of CO detectors was an unreasonably

dangerous condition of the premises, that Defendant was on actual or

constructive notice of that condition, and that condition was the

proximate cause of the Fays' injuries.  On the other hand, in the light

most favorable to Defendant, a reasonable jury could conclude that

Plaintiffs did not prove that there was any corrosion on the heat

---

[16] Defendant, on the other hand, cites *Greiner* for the following quote: "The general knowledge that a hazard could occur is not enough to place a defendant on constructive notice of a hazardous condition."  ECF No. 124, PageID.3366.  But the court did not locate that quote in the case; nor was it readily located in another case.  In any event, the point here is not Defendant's general knowledge that carbon monoxide leaks can occur in a metaphysical sense, it is whether the condition of *this* furnace in *this* room that had no carbon monoxide detectors was sufficient to put Defendant on notice of a hazardous condition.  *Contra Butler v. Gold Mountain Inc.*, No. 336671, 2018 WL 3702560, at *3 (Mich. Ct. App. Aug. 2, 2018) ("the fact that ice buildup may occur in winter, without more, does not permit a court to impute to a defendant constructive notice of a specific ice buildup on a particular day").

exchanger, or that Plaintiffs did not prove that the amount of corrosion present would have put Defendant on notice of a risk of carbon monoxide poisoning, or that Plaintiffs did not prove the condition of the furnace was a proximate cause of the carbon monoxide leak and the lack of CO detectors is not on its own sufficient to impute liability. Summary judgment is not appropriate as to either party.

### F.   The doctrine of *res ipsa loquitor* does not resolve this case.

John Fay argues one step further.  He argues that the doctrine of *res ipsa loquitor* applies here, and because it applies, Plaintiffs should be granted summary judgment pursuant to Fed. R. Civ. P. 56(f)(1). ECF No. 129, PageID.3677, 79.  Plaintiff is right that the doctrine can apply in premises liability cases.  The Restatement of Torts "provides examples of when res ipsa loquitur applies to premises liability-type cases, such as when plaster unexpectedly falls from the ceiling, when a sign falls from a building, or when a chandelier falls from its fixture." *Pugno v. Blue Harvest Farms LLC*, 326 Mich. App. 1, 21 (2018) (citing Restatement (Second) of Torts § 328D).  These examples are analogous to the facts here.  The court is not convinced, however, that the doctrine

62

indisputably applies here or that it excuses the requirement of showing notice.[17]  The Michigan Court of Appeals, for example, rejected application of the doctrine where a plaintiff was scalded by hot water from her shower: "a possible explanation of the events leading up to this accident is that plaintiff, in attempting to turn down the hot water, actually turned the hot water up."  *Hasselbach v. TG Canton, Inc.*, 209 Mich. App. 475, 480 (1994).  Here, Plaintiffs' own explanation is that they turned on the heating element in their room.  True, the condition of the furnace itself was not within Plaintiffs' control, but the point is not as straightforward as John claims.  At minimum, for a jury to agree that the inference applies, it would need to find that the furnace and heating element were in Defendant's exclusive control.  *See Ramadan v. Home Depot, Inc.*, 504 F. Supp. 3d 695, 714 (E.D. Mich. 2020) (finding a jury question as to exclusive control).

---

[17] For one argument that *res ipsa* does not excuse lack of notice, see *Fisher v. Catahoula Parish Police Jury*, 165 So.3d 321, 325 (La. App. 2015) ("The doctrine of *res ipsa loquitur,* though, only addresses the issue of standard of conduct by a defendant.  It fails to address the issue of actual or constructive notice.  This cannot be presumed, except . . . that is, knowledge or notice is presumed if the defect has existed for such a period of time that the [defendant] should reasonably have discovered it.").

But in any event, the more relevant point at this stage is that *res ipsa loquitur* is "merely one kind of . . . circumstantial evidence, in which the jury may reasonably infer both negligence and causation from the mere occurrence of the event and the defendant's relation to it." *Pugno*, 326 Mich. App. at 21 (2018).  By its nature, *res ipsa* is a permissible inference only, one that is not required and therefore is properly put to a jury, not resolved by a court at summary judgment.

## V.     CONCLUSION

To summarize: the court finds that the Fays' claims sound only in premises liability.  Except for the well-established legal duty of an invitor, material disputes of fact remain as to all elements of that claim.  All of the motions for summary judgment (ECF Nos. 123, 124, 125, 126) are **DENIED** on that basis.  To the extent that Defendant sought summary judgment to bar Plaintiffs' ordinary negligence claims, Defendant's motion is **GRANTED IN PART**.  This is not a final order and does not close the case.

**SO ORDERED**.

Date: January 9, 2026                    s/F. Kay Behm
                                         F. Kay Behm
                                         United States District Judge

64